963 A.2d 1218 (2009)
405 N.J. Super. 204
In the Matter of Review and Revision of the Decision to Deny FRESHWATER GENERAL PERMIT NO. 7.
No. A-4593-06T1.
Superior Court of New Jersey, Appellate Division.
Argued December 15, 2008.
Decided February 6, 2009.
*1219 Arnold C. Lakind, Lawrenceville, argued the cause for appellant, Earl F. Stahl, Jr. (Szaferman, Lakind, Blumstein, Blader and Lehmann, attorneys; Mr. Lakind, of counsel and on the brief).
David F. Michelman, Philadelphia, PA, argued the cause for respondent, Samuel N. Barresi (Michelman and Bricker, attorneys; Mr. Michelman and N. Marlene Fleming, of counsel and on the brief).
Lewin J. Weyl, Deputy Attorney General, argued the cause for respondent, New Jersey Department of Environmental Protection (Anne Milgram, Attorney General, attorney; Lewis A. Scheindlin, Assistant Attorney General, of counsel; Mr. Weyl, on the brief).
Before Judges CARCHMAN, SABATINO and SIMONELLI.
The opinion of the court was delivered by
SIMONELLI, J.A.D.
Appellant, Earl Stahl, challenges the issuance of a freshwater wetlands general permit for respondent, Samuel Barresi, by the Department of Environmental Protection (DEP) for Barresi's regulated wetlands activities on Stahl's property. Stahl contends that the DEP's decision to issue the permit without requiring compliance with the Stormwater Management Rules (SMR), N.J.A.C. 7:8-1 to -6.3, was arbitrary, capricious and unreasonable. Stahl also contends that the DEP deprived him of his due process rights and failed to appropriately consider his interests. We reject these contentions and affirm.
Stahl owns approximately ten acres of land on Fostertown Road in Medford, designated as Lot 39.01, Block 302. Barresi owns two adjoining lots designated as Lots 39.05 and 39.06, Block 302, each of which are approximately 2.5 acres. The Stahl and Baressi properties are designated freshwater wetlands.
Barresi purchased his property in 1985. In 1986, he purchased a storm drainage easement on Stahl's property from a former owner. The easement permits Barresi to "construct, alter, and maintain a twenty foot wide storm drainage area, and appurtenances, across" a portion of Stahl's property. Stahl purchased his property in 1987, subject to and with knowledge of the easement.
The Freshwater Water Protection Act[1] (FWPA) divides freshwater wetlands into three categories. The first, and most highly protected category, is freshwater wetlands of exceptional resource value. N.J.S.A. 13:9B-7a. See also N.J.A.C. 7:7A-2.4(b). The two lesser protected categories *1220 are freshwater wetlands of ordinary resource value, which includes man-made ditches, swales or detention facilities, and freshwater wetlands of intermediate resource value, which includes all other wetlands. N.J.S.A. 13:9B-7b and c. See also N.J.A.C. 7:7a-2.4(d) and (e).
At the time Barresi obtained the easement, a man-made freshwater ditch/swale (the ditch) was located both on his property and within the easement on Stahl's property. The freshwater wetlands within the ditch area on Stahl's property is of both ordinary and intermediate resource value. The freshwater wetlands within the ditch area on Barresi's property is of ordinary resource value.
In 1987, the Medford Township Planning Board (Board) approved Barresi's application to subdivide one of his lots to construct a 35,400 square foot warehouse. As part of the approval, the Board reviewed drainage calculations and stormwater management. Barresi installed a foundation, but never constructed the warehouse. Thereafter, in 1994, without requiring a permit, the DEP authorized Stahl to install a parallel piping system in the ditch beginning at the northern end of the easement on Barresi's property and continuing northward to the paved driveway on Stahl's property. The DEP also authorized Stahl to raise the bottom contour elevations of the ditch without a permit.
In 1995, Barresi sought a use variance to permit the construction of an indoor ice skating rink on the previously constructed foundation. The Board granted a use variance subject to site plan review and approval. The Board addressed drainage issues during its review and subsequently granted preliminary and final site plan approval, subject to certain conditions.
During the construction of the ice rink, in order to facilitate storm water drainage from the ice rink, Barresi relocated the ditch to align it with the parallel drainage piping that Stahl had installed. The Board, the Burlington County Soil Erosion Conservation Commission, and the township engineer and code officials approved the work. Barresi completed construction of the skating rink in 1997.
Three years later, based largely on information Stahl provided, on October 19, 2000, the DEP issued a Notice of Violation notifying Barresi of two violations: (1) the removal and relocation of an existing freshwater wetlands ditch located on Stahl's property without a freshwater wetlands general permit; and (2) the direct discharge of storm water from the ice rink into regulated freshwater wetlands.[2] The DEP instructed Barresi to either restore and stabilize the area to its pre-disturbance condition or submit the appropriate freshwater wetlands permit applications.
Because removal of the ditch is a regulated wetlands activity under the FWPA, a freshwater wetlands permit was required. N.J.S.A. 13:9B-3; N.J.S.A. 13:9B-9. Two types of FWPA permits are available: general permits and individual permits. See N.J.A.C. 7:7A-4.1 to -4.5, N.J.A.C. 7:7A-5.1 to -5.27; N.J.A.C. 7A:7.1 to 7.5. Among other requirements, all general permits require compliance with the SMR "[i]f the activities under the general permit meet the definition of `major development' at N.J.A.C. 7:8-1.2." N.J.A.C. 7:7A-4.3(b)10. N.J.A.C. 7:8-1.2 defines "major development," in relevant part, as:
[A]ny "development" that provides for ultimately disturbing one or more acres of land or increasing impervious surface by one-quarter acre or more. Disturbance *1221 for the purpose of this rule is the placement of impervious surface or exposure and/or movement of soil or bedrock or clearing, cutting, or removing of vegetation.
Barresi eventually filed applications for freshwater wetlands general permit 1-Maintenance and repair of existing feature, N.J.A.C. 7:7A-5.1 (GP-1), or alternatively, general permit 7  Humanmade ditches or swales in headwaters, N.J.A.C. 7:7A-5.7 (GP-7). A GP-1 authorizes "activities in freshwater wetlands... required to carry out the repair, rehabilitation, replacement, maintenance or reconstruction of a previously authorized, currently serviceable ... irrigation or drainage ditch[.]" A GP-1 requires that:
[T]he previously authorized ... ditch... shall not have been and will not be put to any use other than as specified in any permit authorizing its original construction. Activities under [a GP-1] shall not expand, widen or deepen the previously authorized feature, and shall not deviate from any plans of the original activity, except that minor deviations due to changes in materials or construction techniques and which are necessary to make repairs, rehabilitation or replacement are allowed provided such changes do not result in disturbance of additional freshwater wetlands or State open waters upon completion of the activity.
[N.J.A.C. 7:7A-5.1(b).]
A GP-7 authorizes "activities in freshwater wetlands that are human-made ditches or in freshwater wetlands that are swales, provided the ditch or swale is located in a headwater." N.J.A.C. 7:7A-5.7(a). A GP-7 may only be issued for work in ditches or swales, which by definition are ordinary resource value wetlands. N.J.A.C. 7:7A-2.4(d)2 and 3. A GP-7 permit also requires compliance "with all applicable requirements at N.J.A.C. 7:7A-4.3," including compliance with the SMR if the activities under the GP-7 meet the definition of "major development." N.J.A.C. 7:7A-4.3; N.J.A.C. 7:7A-5.7(e).
The DEP concluded that Barresi's activities had disturbed a substantial area of intermediate resource value wetlands in the ditch area on Stahl's property. Thus, on November 1, 2005, it denied a GP-1, finding that such a permit "is not applicable as the wetland feature was relocated, resized, and pipes were installed replacing portions of the feature. Based on this, the activity does not meet criteria [N.J.A.C. 7:7-5.1(b) or (c)] above." The DEP also denied a GP-7, finding that "[t]he submitted plans clearly indicate regulated activities have occurred in the intermediate resource wetlands, as well as the ordinary resource value wetlands. Therefore, the GP-7 application is not applicable due to the presence of intermediate resource value wetlands[.]"
Barresi requested an adjudicatory hearing, contending that the DEP made several erroneous findings of fact. He argued, among other things, that his activity within the wetlands feature on Stahl's property concerned ordinary resource value wetlands, which qualifies for a GP-7. The DEP granted Barresi's request for an adjudicatory hearing, and transmitted the matter to the Office of Administrative Law (OAL).
Stahl sought to intervene in the administrative hearing and submitted a response to Barresi's contentions. Stahl contended that Barresi failed to satisfy the requirements for a GP-1 and a GP-7. He argued, as he does here, that because the construction of the ice rink was associated with the ditch relocation, it is considered an activity under the general permit for purposes of considering whether such activity met the definition of a "major development." *1222 Thus, with the inclusion of the ice rink, the entire project created 52,000 square feet (more than one acre) of new impervious surface, it exceeded one quarter acre or more of new impervious coverage, and it disturbed one or more acres of land, qualifying it as a "major development" under N.J.A.C. 7:8-1.2 and requiring compliance with the SMR.
Prior to the OAL hearing, the DEP requested additional documents, which Barresi provided. Thereafter, finding that it had, indeed, made factual errors, the DEP decided to reconsider the denial of a GP-7. It reviewed the history of site disturbances between 1990 and 2007; the project and its history; the wetland feature history and the relocation of the ditch; the project's general compliance with GP-7 criteria; and the project's compliance with conditions that apply to all GP authorizations under N.J.A.C. 7:7A-4.3. Finding that the project only included the activity in the ditch area on Stahl's property, the DEP concluded that the project only involved a 240 foot stretch of ordinary resource value wetlands, not intermediate resource value wetlands, and that it was Stahl's work in the ditch area that had disrupted or destroyed certain intermediate resource value wetlands. The DEP also concluded that:
The total area of disturbance within the relocated [ditch] was approximately 7,000 sq. ft., and no impervious surface or point discharge was placed in the [ditch]. Since less than one acre of wetlands [was] disturbed, and since no impervious surface of point discharge was placed within the wetlands, the [SMR did] not apply to the project.
Upon conclusion of its review, the DEP decided that Barresi qualified for a GP-7. On December 14, 2006, it proposed to settle the appeal by issuing a GP-7. It notified Stahl of the proposed settlement and invited his comments.
On December 22, 2006, Baressi sent Stahl a Notice of Intent to Settle Alleged Freshwater Wetlands Violation, advising him that the DEP authorized a GP-7 and inviting his comments. On January 10, 2007, the DEP published a Notice of Settlement in the DEP Bulletin, and invited public comments.
Stahl submitted several letters commenting on the proposed settlement. Although he was pleased that the DEP had issued a GP-7, Stahl objected to certain portions of the settlement. He again argued that because the project included the ice rink and created 52,000 square feet of new impervious surface, it was a "major development" pursuant to N.J.A.C. 7:8-1.2, requiring compliance with the SMR and installation of a water quality basin.
The DEP issued detailed findings of fact and an explanation of its decision in a fifteen-page letter, dated April 17, 2007, a copy of which it sent to Stahl. The decision notified Stahl that "any person who is aggrieved by these decisions may request a hearing within 30 days of the decision[.]" Stahl never requested such a hearing.
On May 3, 2007, Barresi sent Stahl a Notice of Settlement. On May 7, 2007, and again on June 6, 2007, the DEP published notice of the settlement in the DEP Bulletin. Also, Barresi sent Stahl a copy of a letter to the OAL withdrawing his appeal. This appeal followed.
Our role in reviewing an agency decision is limited. Aqua Beach Condo. Ass'n v. Dep't of Cmty. Affairs, 186 N.J. 5, 15, 890 A.2d 922 (2006); In re Taylor, 158 N.J. 644, 656, 731 A.2d 35 (1999); Brady v. Bd. of Review, 152 N.J. 197, 210, 704 A.2d 547 (1997); In re Freshwater Wetlands General Permits, 372 N.J.Super. 578, 593, 860 A.2d 450 (App.Div.2004). We review "a final agency decision with deference, and will not reverse the ultimate determination of an agency unless [we *1223 conclude] that it was `arbitrary, capricious or unreasonable, or that it lacked fair support in the evidence, or that it violated legislative policies' expressed or implied in the act governing the agency." In re Freshwater Wetlands General Permit No. 16, 379 N.J.Super. 331, 341, 878 A.2d 22 (App.Div.2005) (quoting Campbell v. Dep't of Civil Serv., 39 N.J. 556, 562, 189 A.2d 712 (1963)). "This deference is even stronger when the agency, like DEP in regards to wetlands, `has been delegated discretion to determine the specialized and technical procedures for its tasks.'" In re Freshwater Wetlands, supra, 372 N.J.Super. at 593, 860 A.2d 450 (quoting Newark v. Natural Res. Council, Dep't. of Envtl. Prot., 82 N.J. 530, 540, 414 A.2d 1304, cert. denied, 449 U.S. 983, 101 S.Ct. 400, 66 L.Ed.2d 245 (1980)).
Also, "[we] extend substantial deference to an agency's interpretation of its own regulations." In re Freshwater Wetlands General Permit No. 16, supra, 379 N.J.Super. at 341, 878 A.2d 22, (citing DiMaria v. Bd. of Trs. of Pub. Employees' Ret. Sys., 225 N.J.Super. 341, 351, 542 A.2d 498 (App.Div.), certif. denied, 113 N.J. 638, 552 A.2d 164, (1988)). "`An agency's interpretation of its own rule is owed considerable deference because the agency that drafted and promulgated the rule should know the meaning of that rule.'" Id. at 341-42, 878 A.2d 22 (citing Essex County Bd. of Tax. v. Twp. of Caldwell, 21 N.J.Tax 188, 197 (App.Div.2003)).
We first emphasize that the DEP had the authority to reconsider its denial of a GP-7 and to settle issues regarding the issuance of a permit. Mutschler v. N.J. Dept. of Envtl. Prot., 337 N.J.Super. 1, 14, 766 A.2d 285 (App.Div.), certif. denied, 168 N.J. 292, 773 A.2d 1156 (2001); Trap Rock Indus., Inc. v. Sagner, 133 N.J.Super. 99, 109, 335 A.2d 574 (App.Div.1975), aff'd, 69 N.J. 599, 355 A.2d 636 (1976).
With that said, based upon our careful review of the record and in light of our standard of review, we conclude that Stahl's challenge to the DEP's conclusion that Barresi's activity was not a "major development" is unavailing. A GP-7 specifically governs only man-made ditches. Barresi's activities only involved the ditch on Stahl's property, not the ice rink on Barresi's property. Thus, the DEP's review was limited to the activities in the ditch, not the ice rink. The DEP found that Baressi's activity in the ditch disturbed less than one acre of land, and did not involve placement of impervious surface on more than one-quarter acre of wetlands. Accordingly, the DEP's conclusion that Barresi was entitled to issuance of GP-7 was supported by substantial credible evidence in the record and is not arbitrary, capricious or unreasonable. We defer to the DEP's expertise and experience and the manner in which it interpreted the applicable statutes and regulations, including its interpretation of what constitutes a "major development."[3]
Stahl's remaining contention that the DEP deprived him of due process is without sufficient merit to warrant further discussion. R. 2:11-3(e)(1)(E). However, we add the following comments.
Stahl received notice of the DEP's intent to settle and was afforded the opportunity to submit an objection, which he did. The DEP obviously considered Stahl's objection, as it addressed the SMR issue in its April 17, 2007 decision. Stahl was afforded the opportunity to request a hearing on *1224 that decision, which he failed to do. Stahl received all the due process to which he was entitled. An adjudicatory hearing on his objection was not required. In re Freshwater Wetlands Statewide Gen. Permits, 185 N.J. 452, 456, 888 A.2d 441 (2006).
Affirmed.
NOTES
[1] N.J.S.A. 13:9B-1 to -30.
[2] The DEP subsequently rescinded the second violation notice. That violation is not a subject of this appeal.
[3] We discern no basis to alter the agency's conclusion in this case under the recently-enacted provision at N.J.A.C. 7:7A-2.11, effective October 6, 2008. That new regulation clarifies the definition of a "major development" for an individual permit, not a general permit. Ibid.